As to whether the Plaintiff will suffer hardship absent immediate review, unless the Defendants' decision is definitively unwound, she faces an imminent, painful, and dangerous withdrawal and an attendant risk of discontinued treatment, overdose, *158 and death. See Defs.' Br. 4 (describing "worst [case] scenario" in which "the Plaintiff will be withdrawn from buprenorphine"); see also infra , Section II.C. Both prongs of the ripeness inquiry therefore are satisfied, and the Plaintiff's motion is ripe.
II. Preliminary Injunction
A. Legal Standard
"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett , 731 F.3d 6, 9 (1st Cir. 2013). The Plaintiff bears the burden of establishing that these factors weigh in her favor. Esso Standard Oil Co. (P.R.) v. Monroig-Zayas , 445 F.3d 13, 18 (1st Cir. 2006).
B. Likelihood of Success
The Plaintiff claims that the Defendants have violated the ADA either by denying her the benefit of the jail's health care programs because of her disability or by refusing to make reasonable modifications to a policy or practice in order to allow her to access necessary treatment for her disability.
Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A Title II plaintiff therefore must establish:
(1) that [s]he is a qualified individual with a disability; (2) that [s]he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.
Gray v. Cummings , 917 F.3d 1, 15 (1st Cir. 2019).
Title II plaintiffs can pursue "several different types of claims of disability discrimination," including claims for "disparate treatment ..., i.e., that the disability actually motivated the defendant's adverse conduct," and claims that the defendant "refused to affirmatively accommodate his or her disability where such accommodation was needed to provide 'meaningful access to a public service.' " Nunes v. Mass. Dep't of Corr. , 766 F.3d 136, 145-46 (1st Cir. 2014) ; see also 28 C.F.R. § 35.130(b)(7) (under the ADA, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity").[15] Disparate treatment claims are generally governed by the familiar McDonnell Douglas framework. Id. at 145. In contrast, a plaintiff pursuing a claim for denial of reasonable accommodation "need not directly address and satisfy the elements or methods *159 for proving" a disparate treatment theory. Id.
When considering whether a correctional facility's medical decisions violated the ADA, the First Circuit has "differentiated ADA claims based on negligent medical care from those based on discriminatory medical care." Kiman v. N.H. Dep't of Corr. , 451 F.3d 274, 284 (1st Cir. 2006). The First Circuit has allowed that treatment decisions can be so unreasonable as to constitute evidence of discrimination under the ADA, but has clarified that the
showing of medical unreasonableness ... must be framed within some larger theory of disability discrimination. For example, a plaintiff may argue that her physician's decision was so unreasonable-in the sense of being arbitrary and capricious-as to imply that it was pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes. Or, instead of arguing pretext, a plaintiff may argue that her physician's decision was discriminatory on its face, because it rested on stereotypes of the disabled rather than an individualized inquiry into the patient's condition-and hence was unreasonable in that sense.
Id. at 284-85.
Here, the Defendants do not dispute that they are public entities or that the Plaintiff is a qualified individual with a disability. See Defs.' Post-Trial Br. 21.[16] The Defendants also allow that the Plaintiff is entitled to adequate medical care while she is incarcerated. Defs.' Post-Trial Br. 21; see Penn. Dep't of Corr. v. Yeskey , 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). Instead, the Defendants argue that they have yet to deny the Plaintiff any benefit or accommodation, and that if they do so it will be because their medical staff has made an individualized determination that she does not need her medication and not because of her disability. Defs.' Post-Trial Br. 21-22.
The evidence, however, supports an inference that Ms. Smith was denied necessary medication because she suffers from OUD. Because the Defendants have never asked to assess Ms. Smith's medical needs, they have left Dr. Conner's conclusions uncontroverted. The evidence before me therefore establishes that prior efforts to take the Plaintiff off her medication have not been successful and that the Plaintiff's medication is necessary to her continued health. The Defendants informed the Plaintiff in August of 2018 that she would not be permitted to continue her MAT. The Defendants denied Ms. Smith's requests for buprenorphine without regard to her medical needs and without any true justification. The Defendants suggest that they generally disallow inmates from continuing MAT to prevent diversion of buprenorphine. But the Defendants themselves have described a variety of ways in which the Jail could provide Ms. Smith's buprenorphine outside of the Jail, thereby avoiding the security concerns associated with drug diversion. The Defendants have also allowed that, on the one past occasion when they provided MAT to a pregnant woman, they did so in the Jail itself without any known problems. The Defendants have offered no reason that the same could not be done for Ms. Smith.
The Defendants' out-of-hand, unjustified denial of the Plaintiff's request for her prescribed, necessary medication-and *160 the general practice that precipitated that denial-is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability. Kiman , 451 F.3d at 284 ; see also id. at 286 (correctional facility's withholding of plaintiff's prescribed medications was not "a medical 'judgment' subject to differing opinion[, but] an outright denial of medical services" that could constitute a violation of the ADA); Pesce , 355 F.Supp.3d at 46-47 (plaintiff was likely to succeed on ADA claim, where defendant intended to apply its blanket prohibition on MAT to plaintiff despite plaintiff's past failure to overcome opioid use disorder through detoxification); McNally v. Prison Health Servs. , 46 F.Supp.2d 49, 58 (D. Me. 1999) (denying summary judgment on plaintiff's ADA claim where defendant offered no justification for its practice of giving inmates immediate access to their prescribed medication unless that medication was for HIV).
This inference is bolstered by the Defendants' general attitude towards opioid use disorder. The Defendants' representatives lacked a baseline awareness of what opioid use disorder was despite serving a population that disproportionately dies of that condition. Ms. Willette suggested that learning more about how to treat the disorder was boring. And the facts show that despite an April 2018 offer of significant funds from the State to start an MAT program, the Jail and KVHC have not progressed beyond initial discussions about what such a program would entail and still have not taken steps toward having a provider certified to prescribe buprenorphine.[17] The Defendants' statements and actions suggest the kind of "apathetic attitude" towards individuals with disabilities that the ADA intends to remedy. See Kiman , 451 F.3d at 284. The Defendants' conduct is consistent with the broader stigma against MAT observed by Mr. Hayes, who noted that correctional staff often resist providing MAT because they equate MAT to giving addicts drugs rather than giving people treatment. See Kiman , 451 F.3d at 284 (treatment decisions based on "stereotypes of the disabled rather than an individualized inquiry into the patient's condition" can constitute evidence of discrimination because of disability). Accordingly, I find that the Plaintiff is likely to succeed on her ADA claim under a disparate treatment theory.
In the alternative, I find that the Plaintiff is likely to succeed on the theory that she was denied a reasonable accommodation. The Plaintiff made multiple clear requests to be exempted from the Jail's practice of prohibiting buprenorphine and requiring individuals on MAT to undergo withdrawal.[18] Those requests were denied. Without her desired accommodation, the Plaintiff will be deprived of the only form of treatment shown to be effective at managing her disability and therefore will be denied "meaningful access" to the Jail's health care services. Nunes , 766 F.3d at 145. The Plaintiff's request was not unreasonable, as evidenced by the fact that the Defendants previously provided the same accommodation to a pregnant inmate without issue *161 and by the Defendants' acknowledgement that they could grant the requested exemption in a way that would obviate any security concerns. For the same reasons, the Defendants have not "demonstrate[d] that making [this] modification[ ]" to its practice "would fundamentally alter the nature of" its healthcare or prescription services. 28 C.F.R. § 35.130(b)(7).[19] Because I find that the Plaintiff's ADA claim is likely to succeed under either or both of these theories, I do not address the Plaintiff's likelihood of success on her Eighth Amendment claim.[20]
C. Irreparable Harm
Irreparable injury is harm that "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan , 397 F.3d 56, 76 (1st Cir. 2005). Here, the Plaintiff has presented evidence that if the Defendants curtail her MAT, she will be forced into withdrawal with painful physical symptoms and an increased risk of later relapse, overdose, and death.[21] Studies in the United States and abroad have observed that access to MAT during incarceration is associated with a decreased risk of post-release overdose death. Access to MAT is also correlated with a 75 percent decrease in all-cause mortality while the patient is incarcerated.[22] On the other hand, forced withdrawal from MAT during incarceration has been linked to a significant decrease in post-release resumption of treatment, with lack of treatment in turn being associated with increased risk of overdose and death.
The Defendants claim that these risks are overblown, in large part because the *162 Plaintiff did not relapse, overdose, or die after her first forced withdrawal in 2014.[23] However, as Dr. MacDonald testified, that the Plaintiff was lucky enough to avoid the worst possible outcomes of forced withdrawal in the past does not mean she is immune to risk. See Tr. 138:1-14. Moreover, the Defendants do not account for the changes in the market for illicit opioids in recent years, which have seen the introduction of fentanyl into the supply and an attendant increase in risk that a single relapse may result in overdose and death. Considering all the evidence, I find that the Plaintiff has established a reasonable likelihood that she will suffer irreparable harm absent injunctive relief.
D. Public Interest and Balance of Hardships
I find that the final two factors of the preliminary injunction analysis, public interest and the balance of the hardships, both favor allowing Ms. Smith to continue taking her medication. Ms. Smith will personally benefit from receiving her medication, as she will avoid the wrenching side effects of withdrawal and continue to mitigate her likelihood of relapse. The public interest likewise favors encouraging Ms. Smith to remain on MAT and to continue her recovery. Society will be well served if Ms. Smith is able to continue to care for her children, maintain her housing, and work. History has shown that if she relapses into active use, she will lose all that she has worked so hard to achieve.
While I must accord substantial deference to the professional judgment of prison administrators, Overton v. Bazzetta , 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), I find that in this individual case, granting the Plaintiff's requested injunction will place a limited burden on the Defendants. The Defendants have offered several ways in which Ms. Smith could be given her medication that would avoid any risk of diversion, the Defendants have previously permitted one inmate to receive MAT in-facility with no apparent security impact, and my findings in this case will do little to undermine the Defendants' broader policies or regulations. In particular, the Defendants will be free, going forward, to make exactly the kind of individualized assessments of inmates' medical needs for MAT that they have failed to make here.
Having found that all four preliminary injunction factors favor the Plaintiff, I will grant the Plaintiff's motion.
CONCLUSION
For the reasons stated above, the Court GRANTS the Plaintiff's motion for a preliminary injunction. Pending final adjudication on the merits of this action, the Defendants are hereby ORDERED to provide the Plaintiff with her prescribed buprenorphine during her sentence at the Aroostook County Jail in whatever way the Defendants deem most appropriate in light of the Aroostook County Jail's security needs, including, but not limited to, (1) providing the medication to the Plaintiff in the Aroostook County Jail, (2) taking the Plaintiff into the community on a daily basis to receive her medication, (3) transferring the Plaintiff to another facility capable of providing the Plaintiff her medication, or (4) releasing the Plaintiff on medical furlough if the jail is otherwise unable to accommodate her needs.
The Court also DENIES the Plaintiff's motion to consolidate the preliminary injunction *163 hearing with trial on the merits of this action.
SO ORDERED.

While the Title II regulations refer to "reasonable modification" rather than "reasonable accommodation," courts treat those terms interchangeably. Nunes v. Mass. Dep't of Corr. , 766 F.3d 136, 146 n.6 (1st Cir. 2014).

"Individuals who are recovering from an addiction to drugs may be disabled in the meaning of the ADA" unless they are "currently using drugs, whether addicted or not." Jones v. City of Boston , 752 F.3d 38, 58 (1st Cir. 2014) ; see also 28 C.F.R. § 35.108(b)(2) ("drug addiction" may be a disability under the ADA). Here, there is no dispute that the Plaintiff is in recovery and not actively using.

By way of contrast, Mr. Hayes' team at the Franklin County Jail moved from conception to implementation of an MAT program in three to four months. Tr. 563:21-564:2.

Remarkably, the Defendants claim that "[t]here is no evidence in the record that anyone contacted the jail with a specific request seeking advance approval for a medication for the Plaintiff." Defs.' Post-Trial Reply 6 (ECF No. 112). The record in this case shows with striking clarity that the Plaintiff's counsel contacted the Jail by both phone and fax with unambiguous requests for approval of the Plaintiff's MAT.

This case does not call upon me to find that the Defendants must institute a program that provides MAT for all individuals in the Jail who have opioid use disorder. All that is before me is the request to ensure MAT access for Ms. Smith, an individual who has successfully managed her opioid use disorder with MAT for the last decade.

The evidence presented in this action suggests that a scientific consensus is growing that refusing to provide individuals with their prescribed MAT is a medically, ethically, and constitutionally unsupportable denial of care. E.g. , Pl.'s Ex. 32. Cognizant of the principle of judicial restraint and given my ruling that the Plaintiff is likely to succeed on her ADA claim, I sidestep the constitutional issue at this time. See Ashwander v. Tenn. Valley Auth. , 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

The Defendants illogically insist that withdrawal does not amount to an injury because the Jail has a protocol in place to mitigate withdrawal symptoms. Defs.' Post-Trial Br. 3. This argument misses the mark in two respects. First, there is no indication in the record that the withdrawal protocol eliminates symptoms-in fact, the protocol accounts for the fact that symptoms may persist for days. Second, the Defendants' view assumes that withdrawal is a necessary evil. For incoming inmates who are active users of illicit opioids, withdrawal may be a necessary starting point for any treatment. However, for people like Ms. Smith, whose opioid use disorder is being successfully managed by MAT, withdrawal is a counterproductive, painful experience that is easily identified as an injury.

In an attempt to convince me of the dangers of allowing buprenorphine in the Jail's formulary, the Defendants explained that Suboxone, like many other illicit drugs, is commonly and creatively smuggled into the Jail and used illegally by inmates. There is no question that Suboxone can be abused by people who are not prescribed it to control opioid use disorder. But in describing this reality, the Defendants strengthen the Plaintiff's argument that she is likely to be harmed if her buprenorphine is abruptly stopped. Without her MAT, the Plaintiff will likely experience cravings for opiates and she will be in a facility where illicit drugs are available.

The Defendants also latch on to Dr. MacDonald's statement that the absolute risks of overdose and death are less than 50 percent. But as Dr. MacDonald observed, practitioners consider even a very low absolute risk of death to be medically unacceptable. Tr. 303:15-25.