IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mark Rokita, Jr., and All Others     :
Similarly Situated,     :
          Petitioner     :
     :  No. 340 M.D. 2020
     v.     :
     :  Submitted: November 17, 2021
The Pennsylvania Department     :
of Corrections,     :
          Respondent     :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge[1]
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION
BY JUDGE McCULLOUGH          FILED: April 12, 2022


Before the Court is the preliminary objection of the Department of Corrections (Department) to the petition for review (Petition) filed by Mark Rokita, *pro se*, in our original jurisdiction. Rokita has sought an order compelling the Department to allow him to receive Medication-Assisted Treatment (MAT) for his substance use disorder while incarcerated. The Department has filed a preliminary objection in the nature of a demurrer, contending that Rokita is unable to state a claim upon which relief can be granted because, in the Department's view, under no constitutional or statutory law may Rokita be found to be entitled to such medical

---

[1] This case was assigned to the opinion writer before January 7, 2022, when Judge Cohn Jubelirer became President Judge.

treatment. Upon review, we overrule the Department's preliminary objection and conclude that Rokita's claim may proceed beyond this initial pleading stage of litigation.

### Background

Rokita's Petition avers the following. Rokita is an inmate incarcerated at the State Correctional Institution at Houtzdale (SCI-Houtzdale). Petition ¶1. Rokita has been diagnosed with substance use disorder in connection with his use of opioids. *Id.* ¶¶1, 5, 11. Rokita asserts that he developed a dependence upon opioids after they were prescribed to him following an injury, but when he could no longer obtain them through proper channels, he eventually turned to the illegal opioid pill trade. *Id.* ¶11. Rokita was ultimately arrested and incarcerated for possession of narcotics. *Id.* ¶12.

During his incarceration, and due to his continuing addiction which began with medication prescribed for an injury, Rokita asserts that he has unlawfully obtained and used the medication "Suboxone" in order to treat his condition, which he has purchased through the prison black market. *Id.* ¶¶12-13. Rokita has sought to obtain such medications properly—under the supervision of medical professionals—through his request for MAT or the opportunity to see a doctor who could prescribe him MAT. *Id.* ¶¶1-2, 20. Rokita wrote to a social worker requesting that he be permitted to receive MAT for his disorder, specifically with the medication known as "Vivitrol." *Id.* ¶2. His request was refused because the Department's policies prohibit MAT except for prisoners whose release on parole is imminent. *Id.* ¶¶2-3; Exhibit B (response to Rokita's request for MAT).[2]

---

[2] The Department's website indicates that it permits forms of MAT in several limited circumstances: methadone maintenance for pregnant inmates to protect the fetus from withdrawal; **(Footnote continued on next page…)**

Rokita filed a grievance in which he requested the opportunity to be treated with MAT, but his grievance was denied. Petition ¶¶2-3; Exhibit D (Grievance Officer denying Rokita's grievance and explaining that "there are no [MAT] programs in place within general population institutions in the [Department] for which Rokita would qualify"). For an individual in Rokita's position, the Department offers only group counseling sessions. Petition ¶¶3, 20; Exhibit D.[3]

---

**(continued…)**

Vivitrol injections for inmates being released from custody; oral naltrexone for select new intakes with short minimum sentences; and, as of June 2019, MAT continuation for inmates enrolled in MAT programs as of the time that they enter the Department's custody. *Medication Assisted Treatment (MAT)*, https://www.cor.pa.gov/About%20Us/Initiatives/Pages/Medication-Assisted-Treatment.aspx (last visited April 11, 2022). Consistent with Rokita's averments, the Department does not appear to offer MAT for inmates such as Rokita, who have been incarcerated prior to June 2019 and are unable to obtain a prescription for MAT due to the Department's policies.

[3] The Initial Review Response denying Rokita's grievance stated:

Review of the sick call request which Rokita attaches to the grievance indicates that he submitted his request to psychiatry, specifically requesting Medication Assisted Treatment (MAT), and received [a] response that the psychiatry department does not prescribe MAT. Per information provided by the Drug and Alcohol Treatment supervisor at SCI Houtzdale, the [Substance Use Disorder] department offers self-help groups for all general population members. These groups include Alcoholics Anonymous, Narcotics Anonymous, SMART — Self Management and Recovery Training[,] and Double-Trouble (Co-occurring Mental Health and Addictions). Also, every unit has a certified peer support specialist assigned. They are trained in drug and alcohol treatment techniques, as well as general recovery practices. Each unit also has Psychology staff to help address any of their more urgent psychosomatic symptoms of withdraw[al]/cravings. Rokita can also seek the input of the Vivitrol social worker, as this is a possible option for his treatment immediately prior to his discharge from incarceration.

Petition, Exhibit D.

3

Rokita appealed the grievance determination to the Facility Manager, who denied Rokita's appeal. Petition ¶3. The Facility Manager stated that Rokita had been properly informed of the option available to him, *i.e.*, group counseling. The Facility Manager further told Rokita that "[y]our own actions have led to the issue you grieved and your own failure to follow the proper process has led to your non-treatment." *Id.* ¶4; Exhibit F.[4]

Rokita then sought relief in this Court. Rokita asserts that the Department's refusal to allow him to receive MAT for his substance use disorder is a violation of the Eighth Amendment to the United States Constitution.[5] Petition ¶¶10, 16. Rokita additionally contends that the Department's policy regarding MAT

---

[4] Parenthetically, it is now well understood that the prescription of opioid medications was a substantial contributing cause of the opioid epidemic now afflicting our nation, discussed *infra*. As the United States Department of Health and Human Services (HHS) explains, "[i]n the late 1990s, pharmaceutical companies reassured the medical community that patients would not become addicted to opioid pain relievers and healthcare providers began to prescribe them at greater rates," but, in turn, "[i]ncreased prescription of opioid medications led to widespread misuse of both prescription and non-prescription opioids before it became clear that these medications could indeed be highly addictive." *What is the U.S. Opioid Epidemic?*, https://www.hhs.gov/opioids/about-the-epidemic/index.html (last visited February 18, 2022). The dire consequence of the misuse of these drugs has given rise to a hotbed of litigation against their manufacturers, distributors, and prescribing physicians. *See, e.g.*, Nicolas P. Terry, *The Opioid Litigation Unicorn*, 70 S.C. L. REV. 637, 637 (2019) ("More than forty state attorneys general and innumerable counties, cities, and tribal nations are either investigating or actively litigating over-promotion and related claims against opioid manufacturers and other participants in the opioid prescription drug supply chain."); *see also* Jonathan P. Novak, *Bootstrapping the Opioid Epidemic: Civil Litigators Are Assisting Communities in Recovering from the Opioid Crisis Where the Federal Government Cannot*, 52 MD. B.J. 57 (Spring 2019).

[5] The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment is applicable to the States through the Fourteenth Amendment, U.S. Const. amend. XIV. *See Roper v. Simmons*, 543 U.S. 551, 560 (2005).

violates his rights under the Americans With Disabilities Act of 1990 (ADA).[6] *Id.* ¶¶10, 17, 19. As relief, Rokita requests an order compelling the Department to allow him access to a doctor who specializes in substance abuse disorders and who is authorized to prescribe MAT. *Id.* ¶25.[7]

The Department filed a preliminary objection in the nature of a demurrer.[8] Although the Department facially asserts a single demurrer, it advances several reasons as to why Rokita is unable to state a claim upon which relief may be granted. The Department has developed three such reasons in its brief in support of its preliminary objection: (1) that Rokita's averments do not satisfy the governing standard under the Eighth Amendment with respect to the denial of medical treatment; (2) that Rokita failed to state a medical malpractice claim against the Department and failed to file a certificate of merit in connection therewith; and (3) that Rokita is unable to state a claim under the ADA.

---

[6] 42 U.S.C. §§12101-12213.

[7] In various places in his Petition, Rokita refers generally to other similarly situated inmates and the difficulties that they have experienced in connection with the Department's MAT policy. Petition ¶¶9, 14-15, 24-25. However, Rokita does not expressly state that he has brought this action on their behalf, and he has not attempted to characterize the suit as a class action. As such, we conclude that Rokita has commenced this action solely in his individual capacity, and will not further address any suggestion that Rokita represents any similarly situated inmate. *See, e.g.*, *Sigman v. Department of Corrections* (Pa. Cmwlth., No. 456 M.D. 2020, filed April 29, 2021), slip op. at 3 n.4 (noting that although a prisoner petitioner mentioned similarly situated inmates, he had done so only generally and did not purport to sue on their behalf, and therefore had "sued the Department solely in his individual capacity" and did not file "an impermissible class-action lawsuit").

[8] A preliminary objection may be based upon the "legal insufficiency of a pleading (demurrer)." Pa.R.Civ.P. 1028(a)(4).

**Discussion**

As a preliminary objection, the Department's demurrer "admit[s] as true all well and clearly pleaded material, relevant factual averments, and all inferences fairly deducible therefrom." *Winton v. Pennsylvania Department of Corrections*, 263 A.3d 1240, 1243 n.4 (Pa. Cmwlth. 2021) (quoting *Barndt v. Pennsylvania Department of Corrections*, 902 A.2d 589, 592 (Pa. Cmwlth. 2006)). "However, conclusions of law and unjustified inferences are not so admitted." *Id.* The "question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." *Chichester School District v. Chichester Education Association*, 750 A.2d 400, 402 n.8 (Pa. Cmwlth. 2000) (citing *MacElree v. Philadelphia Newspapers, Inc.*, 674 A.2d 1050 (Pa. 1996)). Accordingly, Rokita receives the benefit of the doubt as to whether his averments are sufficient to state a claim. "Any doubt should be resolved in favor of overruling the demurrer." *Id.*

**A.    Eighth Amendment**

Under the Eighth Amendment, the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). After all, a prison "inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* Plainly, the denial of medical treatment can pose serious risks; but even in "less serious cases," the "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* The Supreme Court of the United States has thus held that the denial of medical care to a prison inmate constitutes a violation of the Eighth Amendment where it amounts to "deliberate indifference to serious medical needs of prisoners." *Id.* at 104.

6

In his Eighth Amendment claim, Rokita asserts that, by refusing to provide him with the opportunity to receive MAT for his substance use disorder, the Department is denying him medical care. Rokita's claim is not wholly novel. Indeed, in recent years, the refusal of correctional institutions to provide MAT to prisoners with substance use disorders has been the subject of both litigation and legal scholarship.[9]

Underlying this developing area of the law is an unfortunate reality, which cannot escape this Court's notice. The prevalence of opioid use and addiction has become a crisis in the United States, to the extent that it has been recognized as a public health emergency by both the federal government and this Commonwealth.[10] As this crisis permeates all levels of society, it is no surprise that its effects are felt within prison walls, where many individuals who are addicted to controlled substances eventually find themselves.[11] It is in the prison context that legal

---

[9] *See generally* Emily Mann, *Advocating for Access: How the Eighth Amendment and the Americans with Disabilities Act Open A Pathway for Opioid-Addicted Inmates to Receive Medication-Assisted Treatment*, 29 ANNALS HEALTH L. ADVANCE DIRECTIVE 231 (2020); Melissa Koppel, *Note*, *Medication-Assisted Treatment: Statutory Schemes & Civil Rights Implications*, 27 CARDOZO J. EQUAL RTS. & SOC. JUST. 145 (2020).

[10] *HHS Acting Secretary Declares Public Health Emergency to Address National Opioid Crisis* (October 26, 2017), http://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html (last visited April 11, 2022); *Gov. Wolf Signs 14th Renewal of Opioid Disaster Declaration*, https://www.governor.pa.gov/newsroom/gov-wolf-signs-14th-renewal-of-opioid-disaster-declaration/ (last visited February 18, 2022).

[11] *See* Petition ¶24 (citing Steve Horn, *Opioid Epidemic Impacts Prisons and Jails*, Prison Legal News, Vol. 30, No. 9 (September 2019), *available at* https://www.prisonlegalnews.org/news/2019/sep/5/opioid-epidemic-impacts-prisons-and-jails/ (last visited February 18, 2022)).

challenges similar to Rokita's have arisen, concerning the practices of correctional facilities that, like the Department, refuse to provide access to MAT in connection with opioid addiction, and offer instead only counseling services.

One such case is *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 40 (D. Mass. 2018). Geoffrey Pesce had been prescribed a MAT program by his physician, pursuant to which he had been receiving daily doses of methadone at a clinic. *Pesce*, 355 F. Supp. 3d at 41-42. Pesce had a suspended driver's license, and, while driving himself to the methadone clinic one day, Pesce was pulled over and arrested for driving with a suspended license, which constituted both a violation of his parole and a new criminal offense. *Id.* at 41. Pesce faced a 60-day sentence for the parole violation, plus a mandatory minimum sentence of at least 60 days' incarceration on the new charge. *Id.* Because the correctional institution in which Pesce would be housed did not provide methadone to its inmates, Pesce filed suit in the federal district court in Massachusetts, seeking a preliminary injunction and temporary restraining order, which would require that he be provided with access to methadone while incarcerated. Like Rokita in the instant case, Pesce relied upon the Eighth Amendment and the ADA as support for his claims.

After determining that Pesce's claims were ripe for review, the district court next assessed Pesce's likelihood of success on the merits for the purpose of assessing his right to injunctive relief. Turning first to the ADA, the court noted that it was undisputed that Pesce, who suffered from opioid use disorder, was a "qualified individual[] with disabilities" for purposes of the ADA. *Id.* at 45. Citing *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998), the district court noted that medical care provided to inmates constitutes a "service" that must be provided without discrimination under the ADA. *Pesce*, 355 F. Supp. 3d at

8

45. The court noted the rationale behind the policy prohibiting the use of opioids in the subject correctional facility—that inmates may hide medications in their mouths, known as "cheeking," and transfer them to other inmates—but the court noted that there had been no specific security concerns articulated relevant to Pesce's proposed methadone intake. *Id.* at 46. Moreover, the court reasoned, "[m]edical decisions that rest on stereotypes about the disabled rather than 'an individualized inquiry into the patient's condition' may be considered discriminatory." *Id.* (quoting *Kiman v. New Hampshire Department of Corrections*, 451 F.3d 274, 285 (1st Cir. 2006)). The proposed treatment program that would be available to Pesce during his upcoming incarceration resembled treatments that previously had been ineffective for Pesce, and "could potentially place Pesce at a higher risk of relapse and overdose upon release." *Id.* at 47. The court concluded that, "[a]bsent medical or individualized security considerations underlying the decision to deny access to medically necessary treatment," the policy prohibiting methadone, as applied to Pesce, was either "arbitrary or capricious—as to imply that it was a pretext for some discriminatory motive," or it was "discriminatory on its face." *Id.* (quoting *Kiman*, 451 F.3d at 284). Thus, the court found that Pesce was likely to succeed on the merits of an ADA claim.

Moreover, the court found that Pesce was likely to succeed on the merits of a constitutional claim under the Eighth Amendment. Invoking the above-mentioned "deliberate indifference" standard articulated in *Estelle*, the court noted that, "[t]o prevail on an Eighth Amendment claim of deliberate indifference based on inadequate or delayed medical care, the plaintiff must satisfy both an objective and subjective inquiry." *Id.* (citing *Perry v. Roy*, 782 F.3d 73, 78 (1st Cir. 2015)). The objective prong requires a showing that the medical need at issue is "sufficiently

9

serious," meaning that it "was either diagnosed by a physician as mandating treatment or is so obvious that a layperson would recognize the need for medical assistance." *Id.* (citing *Burrell v. Hampshire County*, 307 F.3d 1, 8 (1st Cir. 2002); *Gaudreault v. Municipality of Salem, Massachusetts*, 923 F.2d 203, 208 (1st Cir. 1990)). The court deemed this element satisfied for the reasons discussed in its analysis of Pesce's ADA claim. *Id.* The subjective prong of the deliberate indifference standard, the court observed, requires a plaintiff to demonstrate "intent or wanton disregard when providing inadequate care." *Id.* (citing *Perry*, 782 F.3d at 79). Having found the objective prong satisfied, the court focused on the subjective prong.

The court stressed that the "[d]efendants have implemented a blanket policy prohibiting the use of methadone" within the correctional institution, and that they "have stood by the policy without any indication that they would consider Pesce's particular medical history and prescribed treatment in considering whether departure from such policy might be warranted." *Id.* The court noted that, in the First Circuit, "[a]llegations that prison officials denied or delayed recommended treatment by medical professionals may be sufficient to satisfy the deliberate indifference standard" of the Eighth Amendment. *Id.* at 48 (quoting *Alexander v. Weiner*, 841 F. Supp. 2d 486, 493 (D. Mass. 2012)). In Pesce's case, the policy prohibiting methadone in the correctional institution would ensure that Pesce would be denied access to the medication prescribed to him by his physician. Because Pesce sufficiently alleged that the challenged policy "ignore[s] treatment prescriptions given to [him] by [his] doctors," the court concluded that Pesce was likely to succeed on the merits of his Eighth Amendment claim. *Id.* (quoting *Alexander*, 841 F. Supp. 2d at 493). After finding the remaining requisites for a

10

preliminary injunction met, the court ultimately issued the requested injunction, allowing Pesce to continue to receive his prescribed form of MAT during his incarceration.

Notably, there is a distinction between Rokita's situation and that of Pesce. Pesce already had been prescribed a form of MAT by his physician when he faced impending incarceration; Rokita has been incarcerated for some time, and he does not have a prescription for any type of MAT—because the Department will not allow him to obtain one. Nonetheless, it is not clear that this distinction should mean that, as a categorical matter, Rokita is unable to claim the protections of the Eighth Amendment. The court in *Pesce* emphasized the correctional facility's interference with the treatment prescribed by Pesce's physician; here, the Department will not allow Rokita to even see a physician authorized to prescribe that treatment.

It can hardly be doubted that substance addiction is, at least in broad terms, a medical concern. It has long been recognized as such. *See, e.g.*, *Linder v. United States*, 268 U.S. 5, 18 (1925) (holding that physicians could prescribe narcotics to assist addicts in withdrawal, reasoning that the governing statute "says nothing of 'addicts' and does not undertake to prescribe methods for their medical treatment. They are diseased and proper subjects for such treatment . . . ."). Unlike in the days of *Linder*, in which the physician in question prescribed his patient morphine and cocaine to ease the symptoms of addiction, there are now targeted medications that are specifically designed to aid individuals in their recovery from substance use disorders. The question here is whether the denial of that medical treatment protocol raises concerns of a constitutional magnitude.

As noted above, prisons have an obligation to provide adequate medical care to inmates, and "deliberate indifference" to the "serious medical needs" of

11

inmates constitutes a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 104.

This Court has summarized the various elaborations upon that constitutional standard.

As for the existence of a "serious medical need," we have explained:

> Whether the medical need of an inmate is sufficiently serious to constitute an injury amounting to cruel and unusual punishment is an objective inquiry. [*Estelle*, 429 U.S. at 106-07]; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Common factors relied upon by the courts to determine if a medical need is sufficiently serious to fall within the ambit of the Eighth Amendment include whether the medical need is: (i) one that has been diagnosed by a physician as requiring treatment; (ii) one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention; (iii) one where denial or delay of treatment causes an inmate to suffer a life-long handicap or permanent loss; (iv) one where denial or delay of treatment results in unnecessary and wanton infliction of pain; (v) one that significantly affects an individual's daily activities; or (vi) one that causes chronic and substantial pain. *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998); *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

*Tindell v. Department of Corrections*, 87 A.3d 1029, 1038-39 (Pa. Cmwlth. 2014).

With regard to the demonstration of "deliberate indifference," we have summarized:

> In addition to satisfying the objective component of an Eighth Amendment claim, a prisoner must also allege acts or omissions that evidence deliberate indifference on the part of prison officials in order to state a cognizable claim that the prisoner's constitutional right to be free from cruel and unusual punishment has been violated. In *Farmer v. Brennan*, the Supreme Court concluded that the inquiry into whether a prison official was deliberately indifferent is a subjective one, requiring the demonstration of a state of mind akin to criminal recklessness, and held that a prisoner must establish that: (i) the prison official knew of and disregarded an excessive risk to inmate health or safety; (ii)

the prison official was aware of facts from which an inference could be drawn that a substantial risk of serious harm exists; and (iii) the prison official drew the inference. 511 U.S. at 837, 840. The Court also emphasized that the duty of a prison official under the Eighth Amendment is to ensure reasonable safety and that prison officials who respond reasonably to the alleged risk cannot be found liable under the Eighth Amendment, even where the measures taken by prison officials failed to abate the substantial risk. *Id*. at 844-45. Examples of circumstances where a prison official has been found to act with deliberate indifference include where the prison official: (i) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (ii) delays necessary medical treatment based on a non-medical reason; (iii) prevents a prisoner from receiving needed or recommended medical treatment; or (iv) persists in a particular course of treatment in the face of resultant pain and risk of permanent injury. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *Monmouth County*, 834 F.2d at 346-47.

*Id.* at 1039-40.

Rokita's Eighth Amendment claim is stated simply. By Rokita's averment, his opioid use problem has resulted in a medical diagnosis. Rokita's substance use disorder might fall into any number of "serious" categories: being diagnosed by a physician; being obvious to a lay person as requiring medical attention; affecting his daily activities; or causing unnecessary or chronic pain, etc. *See Tindell*, 87 A.3d at 1038-39. Indeed, it is well understood that opioid addiction can result in extreme and potentially dangerous withdrawal symptoms. But even greater risks can follow. Absent effective treatment during incarceration, relapses and overdoses upon release from incarceration are sadly common occurrences—such overdoses are the leading cause of death among inmates after their release. Mann, *supra* note 9, at 233 (citing Byron Alex, et al., *Death After Jail Release: Matching to Improve Care Delivery*, 23 J. CORRECTIONAL HEALTH CARE 83, 86 (2017)). It is thus

13

conceivable that, should his claim be permitted to proceed, Rokita may be able to establish that he has a "serious medical need" within the meaning of the Eighth Amendment.

Yet, the Department has a blanket policy prohibiting *medical* treatment (*i.e.*, MAT) to inmates in Rokita's position, and instead offers only group counseling sessions. Because this decision was made pursuant to a policy prohibiting MAT despite Rokita's express request, the Department certainly "knows of" Rokita's condition and his request for medical treatment, but the Department "intentionally refuses to provide it," which may constitute "deliberate indifference" under our precedent. *Tindell*, 87 A.3d at 1040. Moreover, the response to Rokita's request does not indicate that the Department afforded any individualized consideration of Rokita's circumstance to determine whether a departure from its policy may be warranted. *See Pesce*, 355 F. Supp. 3d at 47 (noting in the context of "deliberate indifference" analysis that defendants had "stood by the policy without any indication that they would consider Pesce's particular medical history and prescribed treatment in considering whether departure from such policy might be warranted").

The Department contends that Rokita merely disagrees with the treatment offered to him, which does not constitute deliberate indifference to his medical needs. It emphasizes that Rokita has been provided with group and talk therapy, and the Department is accordingly not deliberately indifferent to his needs. (Department's Br. at 9-10.) This rationale disregards that there is a difference in kind between the treatment options at issue. We do not doubt the qualifications of those who offer the group therapy sessions to which the parties refer. However, manifestly, talk therapy is not the same as medication. If a physician was to determine that Rokita's condition warrants treatment with MAT, then attending to Rokita's "serious

14

medical need" may require that form of treatment, not merely group therapy sessions. In this regard, we cannot agree with the Department that Rokita merely disagrees with the type of treatment offered to him. Rather, Rokita asserts—correctly, it appears—that there is an entire category of *medical* treatment that the Department's policies have made unavailable to him.

Along these same lines, the Dissent suggests that the Department has made some assessment of the "appropriate and necessary" treatment for Rokita's affliction, *i.e.*, talk therapy sessions. *Rokita v. The Pennsylvania Department of Corrections* __ A.3d __, __ (Pa. Cmwlth. No. 340 M.D. 2020, filed April 12, 2022) (Wojcik, J., dissenting) (Dissenting Opinion), slip op. at 2. This ignores the reality of the situation—that the Department denied Rokita's request pursuant to a categorical policy prohibiting MAT for general population inmates such as Rokita. That is not merely a treatment decision made by a medical professional based on evaluation of individual need. Rather, it is a preemptive denial of an entire class of medical treatment. Notably, this categorical approach also undercuts the Dissent's attempt to distinguish *Pesce*, inasmuch as the decision that the Dissent cites set aside *Pesce* because the court there "specifically distinguished cases where prisons appropriately had denied similar treatment based on individualized assessments of the inmate's medical needs." Dissenting Opinion, __ A.3d at __, slip op. at 2 n.2 (quoting *Chamberlain v. Virginia Department of Corrections* (W.D. Va., Civil Case No. 7:20-cv-00045, filed September 28, 2020), *appeals dismissed*, (4th Cir., Nos. 20-7515 and 21-7349, filed December 22, 2021)). There has been no such individualized assessment here. The Department simply decided that, regardless of whether a

15

medical professional would determine that MAT is appropriate for Rokita,[12] that whole class of medical care is unavailable to him.

Because the provision of adequate medical care in prison is a constitutional necessity, it follows that the denial of an entire class of medical treatment may raise a question under the Eighth Amendment. In this regard, we reject the Dissent's characterization of our rationale as an attempt to engineer social policy and thereby to usurp the roles of the legislative and executive branches of our government. *See* Dissenting Opinion, __ A.3d at __, slip op. at 3. To the contrary, observance of the commands of the Eighth Amendment—like all provisions of the Constitution—is a decidedly judicial concern. We, further, have in no way implemented a "dangerous and unwarranted expansion" of the use of MAT in prisons. *Id.* We reiterate that this matter arrives before us on preliminary objections. We merely conclude that, given recent developments in the law related to the issue before us, it is possible that Rokita can establish that he has been denied necessary medical treatment in violation of the Eighth Amendment. For purposes of surviving preliminary objections, that is enough.

To allow a claim such as Rokita's to proceed beyond the initial pleading stage is not "advocating for social reform," as the Dissent chides. *Id.* at __, slip op. at

---

[12] As noted throughout this opinion, because the Department's policies do not allow MAT, Rokita has not been permitted to see a physician who *could* prescribe him MAT. Thus, the Dissent is correct in stating that Rokita has not supported his claim with the opinion of a medical professional stating that MAT is necessary to treat his condition. However, as should be apparent, an incarcerated individual such as Rokita does not have the freedom to seek out the physician of his choice. An "inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103. Because Rokita can consult only the medical professionals that the Department allows, *who cannot prescribe him MAT*, it is no surprise that Rokita has not obtained a treatment recommendation for MAT. To hold this against Rokita is, in effect, to discriminate against him based upon his status as a prisoner.

16

2. It is providing an individual with access to the courts, so that he may seek protection of a right guaranteed by the Constitution. Indeed, in dismissively characterizing Rokita's condition as "self-inflicted" and proven treatment for that condition as "dangerous," it is the Dissent that reminds of the difficulty of overcoming entrenched attitudes toward addiction which lead to the failure of our institutions to recognize it as a legitimate medical concern—and thus one upon which the Eighth Amendment may bear. *Id.* at __, slip op. at 1, 3. To be sure, Rokita has brought us a challenging issue. But it is one of constitutional significance, and therefore, despite the Dissent's objections, we decline to summarily brush it aside.

In light of the foregoing, under governing precedent, it is conceivable that Rokita could make out a claim that he has been denied medical treatment in a manner that constitutes deliberate indifference to his serious medical needs. Accordingly, to the extent that Rokita claims that the Department's refusal to provide him with access to a physician empowered to prescribe him MAT constitutes a violation of the Eighth Amendment, we are unable to conclude that "on the facts averred, the law says with certainty that no recovery is possible." *Chichester School District*, 750 A.2d at 402 n.8. In this regard, the Department's demurrer is overruled.

### B. Medical Malpractice

To the extent that the Department's demurrer is premised upon medical malpractice law, we find no merit in the suggestion. The Department contends that Rokita has not pleaded the necessary elements of a medical malpractice claim, and that he has not complied with the procedural prerequisites to establishing such a claim. (Department's Br. at 11-12.) The Department is correct, but its point is immaterial. Rokita has not advanced a medical malpractice claim. It is not

17

surprising, then, that he has not pleaded the requirements for such a claim, or followed the procedures applicable to medical malpractice suits.

Because the Department's position on this point is irrelevant, to the extent that its demurrer is premised upon medical malpractice law, it is overruled.

**C.    ADA**

Title II of the ADA (relating to public services) provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.  A "disability," with respect to an individual, is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual"; "a record of such an impairment"; or "being regarded as having such an impairment . . . ."  42 U.S.C. §12102(1)(A)-(C).  A "public entity" includes "any State or local government" as well as "any department . . . of a State . . . or local government."  42 U.S.C. §12131(1)(A)-(B).  It is undisputed that state prisons fall within the definition of a "public entity," and that inmates may bring ADA claims against state prisons.  *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 208-13 (1998).  To establish a violation of Title II of the ADA, a petitioner must show that:  (1) he "is a qualified individual with a disability;" (2) he "was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against;" and (3) "such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."  *Pesce*, 355 F. Supp. 3d at 45 (quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)).

18

Notably, the ADA excludes from the definition of "individual with a disability" an individual who "is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. §12210(a). However, that exclusion does not apply to an individual who:

> (1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
>
> (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or
>
> (3) is erroneously regarded as engaging in such use, but is not engaging in such use[.]

42 U.S.C. §12210(b)(1)-(3). Thus, although *current*, *illegal* drug use will exclude an individual from the definition of an "individual with a disability," an addiction to opiates, itself, may qualify as an "impairment" within the meaning of the ADA. *See, e.g.*, *Start, Inc. v. Baltimore County, Maryland*, 295 F. Supp. 2d 569, 576 (D. Md. 2003) (noting that "there is no question that opiate addiction may qualify as an 'impairment' provided the addict is not currently using drugs").

Although Rokita does refer to past illegal drug use in his Petition, *see* Petition ¶¶12-13, there is no indication in the Petition that Rokita "is *currently* engaging in the illegal use of drugs," such that his substance use disorder may not be considered a disability under the ADA. 42 U.S.C. §12114(a) (emphasis added). Indeed, in his brief opposing the Department's demurrer, Rokita states that he is not "currently" using drugs; he "was self-medicating years ago because there was no adequate treatment" available to him. (Rokita's Br. at 5.) Accordingly, at this

19

juncture, we cannot conclude that Rokita is categorically unable to establish that he is a "qualified individual with a disability" for purposes of the ADA.

Perhaps more importantly, the ADA specifically states that, notwithstanding the above-quoted exclusion regarding illegal drug use, "*an individual shall not be denied health services*, or *services provided in connection with drug rehabilitation*, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services." 42 U.S.C. §12210(c). One might conclude that MAT is a health service, inasmuch as it involves the prescription of medication in connection with a health issue. Certainly, MAT may be deemed a service provided in connection with drug rehabilitation. It follows, then, that even if Rokita were deemed to be excluded from the definition of an "individual with a disability" due to his admittedly illegal drug use at some point in the past, that drug use still could not serve as the basis to deny him access to MAT, if MAT may be found to be among the "health services" or "services provided in connection with drug rehabilitation" that the ADA deems worthy of protection.

As noted above, ADA claims relating to MAT in the prison context have arisen in other courts in recent years. We have already discussed *Pesce*, in which the court concluded that Pesce established a likelihood of success on the merits of an ADA claim concerning a correctional facility's refusal to allow him to continue his MAT program while incarcerated. *Pesce*, 355 F. Supp. 3d at 45-47. Another similar case is *Smith v. Aroostook County*, 376 F. Supp. 3d 146 (D. Me. 2019), *aff'd*, 922 F.3d 41 (1st Cir. 2019), which involved "nearly identical facts and claims" to *Pesce*. *Id.* at 156 n.11. There, Brenda Smith had been prescribed a twice-daily dose of buprenorphine as part of a MAT program for her opioid use disorder, and, like Pesce, she faced a 40-day term of incarceration at a correctional facility that prohibited the

20

use of that medication. *Id.* at 149. The only treatment program available to Smith in the correctional institution was substance abuse counseling. *Id.* at 152. Smith filed suit and sought a preliminary injunction to allow her to continue taking her prescribed medication during her incarceration, relying upon the Eighth Amendment and the ADA. Adopting similar reasoning as the court in *Pesce*, the district court concluded that Smith was likely to succeed on the merits of her ADA claim. *Id.* at 160-61.[13] The court found that Smith's ADA claim could be based upon a disparate treatment rationale or based upon the failure to provide a reasonable accommodation, and that she would be likely to succeed under either or both of those theories. *Id.* at 160-61.

As noted above, the instant circumstance differs somewhat from that at issue in *Pesce* and *Smith*, in that the plaintiffs in those cases already had been prescribed forms of MAT by their physicians when they faced impending incarceration. Rokita is already incarcerated, and he does not have a prescription for any type of MAT. However, should Rokita's lack of a prescription somehow be deemed to render him ineligible for the ADA protection that Pesce and Smith enjoyed, then this merely highlights the unjust conundrum presented by the Department's policy. Rokita cannot obtain a prescription for MAT because the Department will not allow him to do so. If this necessarily excludes him from the ambit of the ADA, then the Department—the entity against which Rokita would be seeking the protections of the ADA—would effectively have prevented Rokita from meeting the conditions that would enable him to claim those protections against it.

---

[13] Unlike the court in *Pesce*, the court in *Smith* declined to address Smith's Eighth Amendment claim because it found Smith's ADA claim to be sufficient to warrant the relief requested. *Smith*, 376 F. Supp. 3d at 161.

The Department, notably, does not directly contest Rokita's status as a qualified individual with a disability. Rather, it argues that Rokita has not been denied access to a public service "by reason of" his disability, so as to establish a claim under 42 U.S.C. §12132. Rather, the Department contends, it rejected Rokita's request because the Department determined that the talk therapy programs that it offers are sufficient to address Rokita's ailment. (Department's Br. at 13.) We do not find this to be a sufficient basis upon which to conclude that Rokita is categorically unable to state a claim under the ADA. Notably, the plaintiffs in *Pesce* and *Smith* were similarly situated—they were also qualified individuals with a disability similar to Rokita's. Yet, they were found to be likely to succeed on the merits of their ADA claims based upon correctional facilities' refusals to authorize MAT. One could have made the same argument in those cases—that Pesce and Smith were not denied a service "by reason of" their disabilities for purposes of the ADA, but merely because alternative services were offered. In *Pesce*, the court accepted Pesce's argument that the refusal to allow him to continue MAT "deprives him of the benefit of health care programs, and that such conduct constitutes discrimination on the basis of his disability." *Pesce*, 355 F. Supp. 3d at 45. The court in *Smith* determined that the refusal to allow Smith to continue MAT was "so unreasonable as to raise an inference" that her request was denied "because of her disability." *Smith*, 376 F. Supp. 3d at 160.

Of significant note, very recently as of the time of this writing, the United States Department of Justice (DOJ) completed an investigation of several county court programs in Pennsylvania, and determined that banning MAT for individuals under court supervision or as a condition of participation in specialty drug treatment courts constitutes a violation of the ADA. On February 2, 2022, the DOJ

sent a letter to counsel for the Administrative Office of Pennsylvania Courts, setting forth its findings regarding the ADA violations, specifying corrective measures that must be taken with regard to the handling of MAT, and providing notice that the DOJ may take further action if the violations are not remedied. *See* The United States' Findings and Conclusions Based on Its Investigation of the Unified Judicial System of Pennsylvania under Title II of the Americans with Disabilities Act, DJ # 204-64-170, February 2, 2022, *available at* https://www.ada.gov/ujs_lof.pdf (last visited April 11, 2022). Specifically, the DOJ concluded that the Pennsylvania Unified Judicial System, "through the actions of its component courts, violated Title II of the ADA by at times prohibiting and at other times limiting the use of disability-related medication to treat [opioid use disorder] by individuals under court supervision." *Id.* at 1. These prohibitions and limitations upon MAT "discriminated against the complainants in violation of the ADA by denying them an equal opportunity to benefit from court services, programs, or activities—including probationary and treatment court supervision—because of their disability." *Id.* at 1-2. Significantly, it appears that the DOJ has no difficulty concluding that the denial of MAT constitutes discrimination *because of* a disability, or in the language of the ADA, "by reason of" such disability. 42 U.S.C. §12132.[14]

Likewise here, the Department's policy deprives Rokita of the benefit of a health service that could potentially be beneficial in treating his disability. Absent that disability, moreover, Rokita would have no reason to request the service in

_____

[14] Plainly, the DOJ's determination that existing statutory law protects those who would be denied MAT further undercuts the Dissent's suggestion that this Court has somehow acted inappropriately by allowing a similar ADA claim to proceed beyond preliminary objections. It appears that, in the view of the federal government, the "social policy reform" about which the Dissent frets has already been achieved by the ADA. Dissenting Opinion, __ A.3d at __, slip op. at 3.

question. Under these circumstances, it is conceivable that Rokita could establish that he has been denied the benefit of a health service by a public entity, by reason of his disability, and that a claim is viable under Title II of the ADA. As such, we cannot conclude that, "on the facts averred, the law says with certainty that no recovery is possible." *Chichester School District*, 750 A.2d at 402 n.8. Therefore, to the extent that the Department's demurrer is premised upon Rokita's inability to state a claim under the ADA, it is in that respect overruled.

Having rejected the asserted grounds for the Department's demurrer, its preliminary objection is overruled.

                                  _____

                                  PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Mark Rokita, Jr., and All Others Similarly Situated, | : | |
| Petitioner | : | |
| | : | No. 340 M.D. 2020 |
| v. | : | |
| | : | |
| The Pennsylvania Department of Corrections, | : | |
| Respondent | : | |

## ***ORDER***

AND NOW, this 12th day of April 2022, the preliminary objection of the Pennsylvania Department of Corrections is OVERRULED. The Department is directed to file an answer to the Petition for Review within 30 days of this order.

_____
PATRICIA A. McCULLOUGH, Judge

Mark Rokita, Jr., and All Others :
Similarly Situated, :
                                 :
                   Petitioner :
                                   :
                v. : No. 340 M.D. 2020
                                   : Submitted: November 17, 2021
The Pennsylvania Department of :
Corrections, :
                                   :
                  Respondent :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE ANNE E. COVEY, Judge
                   HONORABLE MICHAEL H. WOJCIK, Judge
                   HONORABLE CHRISTINE FIZZANO CANNON, Judge

DISSENTING OPINION
BY JUDGE WOJCIK                          FILED: April 12, 2022

I dissent.

In his petition for review, Mark Rokita, Jr. (Inmate) does not allege that he is ***not*** receiving treatment for his admitted self-inflicted addiction to prison black-market drugs,[1] or that ***any*** medical professional has determined that Medication

---

[1] The Initial Review Response resolving Inmate's grievance regarding his addiction treatment states, in relevant part:

> Review of the sick call request which [Inmate] attaches to the grievance indicates that he submitted his request to psychiatry, specifically requesting Medication Assisted Treatment (MAT), and

**(Footnote continued on next page…)**

Assisted Treatment (MAT) is medically necessary to treat his illegal drug addiction. There is simply no allegation that Inmate has not received, nor will receive, necessary medical treatment should his physical condition deteriorate to the point that medical intervention is necessary to avoid a substantial risk of serious harm. Rather, Inmate merely asserts that the treatment that has been deemed to be appropriate and necessary by the prison authorities for his addiction to illegal black-market drugs, including his treating medical professionals, is not the treatment that he prefers.

The Majority, in advocating for social reform by expanding the use of MAT in Pennsylvania's prisons, has not cited any controlling legal authority to support the proposition that Inmate has pleaded a viable Eighth Amendment claim,[2]

---

received [a] response that the psychiatry department does not prescribe MAT. Per information provided by the Drug and Alcohol Treatment supervisor at [the State Correctional Institution at] Houtzdale, the [Substance Use Disorder] department offers self-help groups for all general population members. These groups include Alcoholics Anonymous, Narcotics Anonymous, SMART Self-Management and Recovery Training and Double-Trouble (Co-occurring Mental Health and Addictions). Also, every unit has a certified peer support specialist assigned. They are trained in drug and alcohol treatment techniques, as well as general recovery practices. Each unit also has Psychology staff to help address any of [the inmates'] more urgent psychosomatic symptoms of withdrawal/cravings. [Inmate] can also seek the input of the Vivitrol social worker, as this is a possible option for his treatment immediately prior to his discharge from incarceration.

Petition for Review at Exhibit D.

[2] The Majority's reliance on *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018), in this regard, is misplaced. As a federal district court has explained:

**(Footnote continued on next page…)**

U.S. Const. amend. VIII, or a valid claim under the Americans with Disabilities Act of 1990 (ADA).[3] Instead, the Majority appears to advocate for social policy reform on the expanded use of state-funded controlled substances in Pennsylvania prisons. In observing proper judicial restraint, specifically, that it is our General Assembly that is charged with enacting laws and social policy, and the executive branch through the Department of Corrections (DOC) that is empowered to make policy decisions regarding the operation of our state prisons, I cannot support the Majority's dangerous and unwarranted expansion of the use of MAT in these facilities.[4]

---

> Most significantly, though–and unlike the plaintiffs in these other cases–[the inmate herein] has not presented any medical testimony to support his assertion that he needs MAT to treat his [opioid use disorder]. Indeed, in granting relief, the *Pesce* court specifically distinguished cases where prisons appropriately had denied similar treatment based on individualized assessments of the inmate's medical needs. 355 F. Supp. 3d at 47-48. [The inmate's] request for injunctive relief is akin to those cases. An individualized assessment has been made, but [the inmate] has failed to show that the treatment he wants is medically necessary for him.

*Chamberlain v. Virginia Department of Corrections* (W.D. Va., Civil Case No. 7:20-cv-00045, filed September 28, 2020), *appeals dismissed*, (4th Cir., Nos. 20-7515 and 21-7349, filed December 22, 2021), slip op. at 6.

[3] 42 U.S.C. §§12131-12134. By its terms, the ADA excludes from the definition of "a qualified individual with a disability" an individual who "is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. §12114(a). Admittedly, Inmate does not fit within any of the statutory exceptions to this exclusion. *See* 42 U.S.C. §12114(b)(1) and (2) (the illegal drug use exclusion does not apply to an individual who "(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such [illegal] use" or "(2) is participating in a supervised rehabilitation program and is no longer engaging in such [illegal] use.").

[4] As the federal district court also observed:

**(Footnote continued on next page…)**

The Majority's position respecting this Dissent notwithstanding, I firmly believe that Inmate has not pleaded either a constitutional or statutory right to receive self-prescribed, on demand, taxpayer-funded controlled substances while serving his sentence of imprisonment. Accordingly, unlike the Majority, I would sustain DOC's preliminary objection and dismiss Inmate's petition for review.

 

 

_____
MICHAEL H. WOJCIK, Judge

Judge Covey joins in this Dissenting Opinion.

_____

> For support, [the inmate] points to other states that he alleges provide MAT to their prisoners, such as Rhode Island, Pennsylvania, Massachusetts, and Washington. The court's own research has disclosed that at least some other prison systems, including the federal Bureau of Prisons (BOP), apparently do provide more extensive MAT options to offenders. *Crews v. Sawyer* [(D. Kan., No. 19-2541-JWB, filed March 31, 2020)] (explaining 2019 changes to the BOP's policies regarding drug addiction treatment, which included expanded use of MAT); *but see Advocating for Access: How the Eighth Amendment and the Americans with Disabilities Act Open a Pathway for Opioid Addicted Inmates to Receive Medication Assisted Treatment*, 29 Annals Health L. Advance Directive 231, 240 & n.63 (Fall 2020) (citing to a 2018 study showing that "**[*l*]ess than one percent of the more than 5,000 prisons and jails in the United States allow access to MAT**.").

*Chamberlain*, slip op. at 3 n.4 (emphasis added). Clearly, the fact that as of 2018, more than 99% of our nation's prisons and jails do not permit the use of MAT *at all*, demonstrates that this Court has neither the authority nor the resources to adequately determine whether such treatment is appropriate or necessary in any particular case, or under what circumstances its use in our prisons should be expanded. The foregoing also undermines the Majority's attempt to normalize the use of MAT as an appropriate treatment option in a prison setting. Again, such a determination should be left to the branches of government granted the authority to make this social policy determination.